# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| MEDCHOICE RETENTION GROUP, INC, <br><br> Plaintiff, <br> v. <br> ROBERT G. RAND, M.D., and RAND FAMILY CARE LLC, <br><br> Defendants. | Case No. 3:16-cv-00418-MMD-CBC <br><br> AMENDED ORDER[1] |

## I. SUMMARY

Defendant Robert G. Rand ("M.D. Rand") pleaded guilty and was sentenced for criminal conduct, including involuntary manslaughter, in part related to the death of a patient. That tragic event led to lawsuits against M.D. Rand and ultimately this coverage dispute between M.D. Rand and Rand Family Care LLC's (collectively, "Defendants") and Plaintiff MedChoice Retention Group, Inc. ("MedChoice"). M.D. Rand's factual admissions that supported his guilty plea necessarily compel a finding for rescission of his MedChoice insurance policy, a result which the Court recognizes does not inure to the benefit of the patient's family and others impacted.

///
///
///

---

[1] This order was amended to correct a typo in the original. On page 9 of the original order, the Court stated that Michael Yenick died on October 2, 2018. To be clear, Michael died on October 2, 2015.

Before the Court is MedChoice's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment ("Motion")[2] (ECF No. 65) which it filed after M.D. Rand pleaded guilty (*id.* at 7; ECF No. 52-10). The Court has reviewed Defendants' response (ECF No. 77) and MedChoice's reply (ECF No. 81).[3] For the following reasons, the Court grants the Motion (ECF No. 65) upon the finding that MedChoice is entitled to rescind the liability policy.

**II.    RELEVANT BACKGROUND**

**A.    The MedChoice Insurance Application and Policy**

M.D. Rand submitted application documents to MedChoice for professional liability coverage in December 2015. (ECF Nos. 52-2; 52-3; 52-5.) At the time, M.D. Rand was aware that at least one of his patients—Michael Yenick ("Michael")—had died at the age of 33, that he had prescribed Michael 45 dosages and 180 dosages of oxycodone only several days apart, and that Michael's mother had called him the day before the 45 dosages to warn him that Michael could die from further prescriptions of oxycodone. (ECF No. 77 at 3 (noting that "Dr. Rand does not generally dispute the facts set forth in Medchoice's timeline. He disputes MedChoice's characterization of the facts, the inferences of the facts and the relevancy of certain facts"); ECF No. 65 at 9–11 (MedChoice's timeline); ECF No. 52-50 at 7–8.) On October 2, 2015, a coroner requested Michael's medical records from M.D. Rand. (ECF No. 52-1 at 2.)

On the policy application documents, M.D. Rand responded "no" to questions inquiring ("the Questions"), *inter alia*:

///

---

[2]MedChoice moves on the basis of the First Amended Complaint (ECF No. 52) ("FAC"), albeit Defendants have not responded to the FAC. (*See* ECF No. 65 at 12 n.9.) Defendants did answer the original complaint. (*Id.*; ECF No. 14.)

[3]MedChoice separately filed an objection to challenge evidence presented in support of Defendants' opposition to MedChoice's Motion. (ECF No. 83.) To the extent MedChoice disputes Defendants' proffered evidence, MedChoice should have asserted their arguments in their reply brief. A separate objection is improper and is an apparent attempt to circumvent LR 7-3(a)'s limit on the length of MedChoice's reply brief. Accordingly, the Court will strike MedChoice's separate objection (ECF No. 83.)

2

> Are you aware of any potentially compensable events resulting from patient care?
>
> Have there been any injuries to patients or bad outcomes from services rendered by you or anyone in your office?
>
> Do you have knowledge of any claims, *potential claims*[4], or suits in which you, your employees, . . ., may become involved . . .?
>
> Have you had a request for medical records of a patient which has been reported to you current carrier?
>
> Are you aware of any incident from 1/1/2011 till Present that may reasonably lead to a claim or suit being brought against you, even if you believe the claim or suit would be without merit?

(ECF No. 52-2 at 2; ECF No. 52-3 at 8; ECF No. 52-5 at 2.) (Emphasis added.) M.D Rand also signed the following "Applicant's representation": "I know of no other relevant facts which might affect the underwriter's judgment when considering this application or which might be material to the underwriter's risk." (ECF No. 52-3 at 10.)

MedChoice attests—and Defendants do not dispute—that it relied on the answers M.D. Rand submitted in his application in deciding to issue a policy to Defendants ("the Policy") on January 4, 2016. (ECF No. 65-4 (Nauman Decl) at 3.) The Policy became effective December 15, 2015, and was to expire December 15, 2016, with an extended reporting period of February 13, 2017. (ECF No. 52-12 at 2, 18.) The Policy excludes coverage "for any claim or potential claim against the named insured of which the name insured was aware, or reasonably should have been aware, prior to the effective date of [the] policy." (*Id.* at 11). Nor does it cover claims "arising out of a criminal, dishonest, fraudulent or malicious act or omission by such insured." (*Id.*)

MedChoice aver, again without challenge, that later in January 2016, M.D. Rand requested certain policy limit increases of the Policy and MedChoice issued an endorsement increasing the limits ("Endorsement"), based upon the previously submitted application materials. (ECF No. 65-4 (Nauman Decl.) at 3.)

///

---

[4]The Policy defines a "potential claim" to mean "any medical incident which would have put a reasonable person on notice that a written notice or demand to the insured or a lawsuit against the insured may result." (ECF No. 52-12 at 15.)

In July 2017, M.D. Rand pleaded guilty to involuntary manslaughter for the death of Michael in *United States v. Rand et. al,* No. 3-16-cr-00029-MMD-WGC ("Criminal Case"). (ECF No. 52-10 at 4–8.) In the same plea agreement, he also pleaded guilty to the unlawful distribution of a controlled substance to an individual with the initials R.W. (*Id.* at 8–9.) As to R.W., M. D. Rand admitted that from January 2011 to April 2016, he without a legitimate medical purpose and not in the usual course of professional practice prescribed R.W. a number of opioids, including oxycodone, Percocet, and fentanyl. (*Id.*)

**B. Lawsuits for which Defendants Have Received or Seek Liability Coverage**

MedChoice's FAC and Motion concern coverage for three specified lawsuits filed in the Second Judicial District Court in and for the County of Washoe: (1) *Cyndi Papez Yenick et al. v. Robert Rand, M.D., et al.*, Case No. CV-16-01004 ("Yenick Lawsuit"); (2) *Eric Zuhlke et al. v. Robert Rand, M.D., et al.*, Case No. CV16-01641 ("Zuhlke Lawsuit"); and (3) *Don Robertson, II, as Special Administrator of Dorothy M. Fribourg; Don Robertson, II, individually as son and heir of Dorothy M. Fribourg v. Robert Rand, M.D.; Rand Family Care*, Case No. CV 17-0099 ("Fribourg Lawsuit"). (ECF Nos. 52-7, 52-8, 52-11.) The three lawsuits allege claims for: medical negligence resulting in wrongful death, deceptive trade practices, negligent misrepresentation, and neglect of a vulnerable person based on M.D. Rand's practice of prescribing opioids. (*Id.*) The parties have resolved the coverage issues concerning the Zuhlke Lawsuit. (ECF No. 85). Thus, only the other two named legal actions remain. The Court will not consider the facts or claims pertaining to the Zuhlke Lawsuit moving forward.

**C. MedChoice's Claims and Motion**

The FAC involves five claims for relief. In the first two counts, MedChoice alleges that it is entitled to rescission of the Policy (Count I) and the increase in limits endorsement (Count II) under NRS § 687B.110. (ECF No. 52.) Count II is asserted as an alternative to Count I. (*Id.* at 14.) As an alternative to the two rescission counts, MedChoice asserts Count III, seeking declaratory relief and arguing non-coverage based on specified

4

exclusions within the Policy going to the Yenick Lawsuit, and that Yenick's claims are outside the scope of the Policy. (*Id.* at 15–18.) In Count IV, MedChoice also seeks declaratory relief that it has no duty to defend or indemnify any claim reported or lawsuit filed after February 13, 2017—expiration of the extended reporting period, pertinent to only the Fribourg Lawsuit. (*Id.* at 18; ECF No. 65 at 28.) Count V is contingent on a finding that there is no coverage for the Yenick Lawsuit, and MedChoice seeks a declaration that it is entitled to reimbursement for defense costs expended in that lawsuit, subject to a motion for final judgment and evidence of the expended costs. (ECF No. 52 at 18–19; ECF No. 65 at 29.)

MedChoice moves for summary judgment on either bases of rescission, or in the alternative declaratory relief on the remaining specific claims, and declaration on its entitlement to reimbursement claim. (ECF Nos. 65, 85.)

## III. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250–51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all

inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION[5]

MedChoice's requests for summary judgment on its first and second claims for relief are specifically made pursuant to NRS § 687B.110(2), (3). (ECF No. 65.) As a preliminary matter, both claims (Counts I and II) are essentially one and the same, given MedChoice's unchallenged averment that it relied on the answers in the Policy application documents[6]—the subject of Count 1— to issue the Endorsement—the subject of Count 2.

///

---

[5] Defendants erroneously conflate MedChoice's lawsuit seeking rescission as the equivalent of rescission. (*See* ECF No. 77 at 22.) *See Great Am. Ins. Co. v. Gen. Builders, Inc.*, 943 P.2d 257, 262 n.6 (Nev. 1997) (explaining rescission and distinguishing unilateral from equitable rescission). Further, relying on an inapposite case, Defendants also inaccurately argue that MedChoice waived its claim for rescission by defending in the Yenick Lawsuit, and in arguing an alternative partial summary judgment theory under the contract (ECF No. 77 at 16.)

[6] Defendants attempt to argue that the Policy with MedChoice was merely a "renewal" of its policy with another provider. (ECF No. 77 at 4.) The argument is irrelevant to the Motion which concerns the Policy effective December 15, 2015, with an extended February 13, 2017 reporting period. A "renewal" of a claims-made-and-reported malpractice policy—which the Policy undisputable is (*see* ECF No. 52-12; ECF No. 81 at

Accordingly, if M.D. Rand committed a violation of NRS § 687B.110 when he completed the application documents, both the Policy and Endorsement would be rescinded on that basis. MedChoice particularly asserts that it would not have issued the Policy or Endorsement had it known of the circumstances leading to Michael's death, which M.D. Rand knew, or it had known that M.D. Rand had been prescribing opioids without legitimate medical purpose. (ECF No. 65 at 19–21; ECF No. 81 at 8, 12–14, 18.) The Court agrees with MedChoice and will grant summary judgment on these two claims.

Pertinently, NRS § 687B.110 provides that recovery can be denied under an insurance policy where "[m]isrepresentations, omissions, concealment of facts and incorrect statements" were made in the policy application that were

> 2. Material either to the acceptance of the risk, or hazard assumed by the insurer; or
>
> 3. The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate, or would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

NRS § 687B.110(2), (3). If either of these factors apply, MedChoice would be justified in rescinding the Policy and Endorsement. *See Morales v. Prudential Ins. Co. of America*, Nos. 48165, 48443, 50181, 2008 WL 6124614, at * 1 (Nev. Dec. 11, 2008) (unpublished).[7]

MedChoice argues, *inter alia,* that the Court may rely on M.D. Rand's plea deal in his Criminal Case to find that at the time M.D. Rand completed the Policy application and Endorsement, he knew that he had been unlawfully prescribing opioids, that such prescriptions resulted in Michael's death, and that he provided Michael and R.W. opioids

///

---

9; ECF No. 77 at 15 ("Medchoice covers claims or potential claims reported during the policy period.")—as much as an original policy, only provides coverage for claims made and reported within the applicable policy period. *See Physicians Ins. Co. of Wis., Inc. v. Williams*, 279 P.3d 174, 176–77 (Nev. 2012) (explaining the distinction between an occurrence-based policy and claims-made-and-reported policy).

[7]While Nevada dictates that unpublished opinions cannot be relied as binding legal authority or be regarded as precedent, the Court finds this case persuasive as limited to the cited premise.

without legitimate medical purpose. (ECF Nos. 65, 81.) Defendants, however, without citation to authority, argue that MedChoice cannot base its Motion upon admissions M.D. Rand made as part of his July 2017 guilty plea agreement to argue rescission under NRS § 687B.110. (ECF No. 77 at 1, 9–10.)

The Court disagrees with Defendants. In Nevada, "evidence of a guilty plea . . . from a prior criminal proceeding is admissible in a subsequent civil proceeding, subject to NRS [§] 48.035(1)."[8] *Taylor v. Thunder*, 13 P.3d 43, 45–46 (Nev. 2000). The Court concludes *Taylor*'s pronouncement is substantive law,[9] and turns to the Ninth Circuit to decide the procedural question of whether a plea deal may be admitted as undisputed evidence in considering summary judgment. *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938) (standing for the proposition that in a diversity case, a federal court will apply substantive law of the forum state—in this case Nevada—and the procedural rules established for the federal courts); *see also Stroud v. Cook*, 931 F. Supp. 733, 736 (D. Nev. 1996) ("Rules of evidence are at least nominally rules which govern matter of procedure, rather than rules which allocate 'substantive rights.'").

In *In re Slatkin*, the Ninth Circuit held that a "plea agreement is admissible under Federal Rule of Evidence 807" and may be considered in granting summary judgment. 525 F.3d 805, 812 (9th Cir. 2008). The admissions in a plea deal may be given preclusive effect as providing sufficient factual basis for acts and *mens rea* to the extent required in a subsequent related civil proceeding. *See id.* at 813–815; *see also Desert Cab Co. v.*

///

---

[8] *See also Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 568 (1951) (noting that civil defendant may be estopped from relitigating an issue that was decided against it in a previous criminal action).

[9] *See, e.g., Stroud v. Cook*, 931 F. Supp. 733, 737 (D. Nev. 1996) (finding NRS § 41.133 to be a substantive—not procedural—rule). Like *Taylor*, NRS § 41.133 permits a prior criminal judgment of conviction to be considered as evidence in a subsequent civil proceeding, and is not part of Nevada's evidence code. *Id.* NRS § 41.133 particularly appears to require not only that the criminal judgment be admitted as evidence, but that it be regarded as conclusive proof of the facts needed to impose civil liability for injury related to the injury of the victims in the criminal proceeding. *Id.*

*Marino*, 823 P.2d 898, 900–91 (1992) (finding that judgment of an assault and battery conviction was properly admitted into evidence pursuant to NRS § 41.133 as conclusive proof of the criminal defendant's civil liability to the victim). The Court will accordingly consider M.D. Rand's July 2017 plea deal in this case.[10]

Here, in pleading to the involuntary manslaughter of Michael, *inter alia*, M.D. Rand admitted that he: *acted* with gross negligence, defined as wanton or reckless disregard for human life; and that he either knew that such conduct was a threat to the lives of others or knew of the circumstances that would reasonably cause him to foresee that such conduct might be a threat to the life of others. (ECF No. 52-10 at 4–5.) One factual basis for the plea was that:

> On September 22, 2015, [Michael's] mother called and spoke with Dr. Rand, informing Dr. Rand of relevant, present circumstances as to [Michael's] health and substantial risks in terms of Dr. Rand's prescriptions of oxycodone to [Michael], begged Dr. Rand not to prescribe Michael anymore oxycodone, and warned Dr. Rand that he would kill her son if he continued to prescribe [Michael] oxycodone

(*Id.* at 7.) The following day M.D. Rand prescribed Michael 45 doses of oxycodone. *Id.* Only seven days after that, he prescribed another 180 dosages of oxycodone to Michael. (*Id.*) He admitted to doing so, "not for a legitimate medical purpose and not in the usual course of professional practice." (*Id.*) He admitted to acting with gross negligence in so prescribing, particularly in light of circumstances, such as the call from Michael's mother. (*Id.* at 7–8.) Michael died on October 2, 2015—two days after he received and filled the prescription for 180 dosages. (*Id.* at 8.) As noted, M.D. Rand admits that he knew about Michael's October 2, 2015 death at the time he completed the application (ECF No. 77 at 11; *see also* (ECF No. 52-1 at 2 (coroner October 2, 2015, medical record request to M.D. Rand).) These factual and mental state admissions are all incontrovertible information that M.D. Rand knew at the time he applied for the Policy in December 2015.

///

---

[10] The Court has also concluded that there is no conflict between the substantive *Taylor* rule and the procedural evidentiary rule—Federal Rule of Evidence 807—that the Ninth Circuit relied on in *In re Slatkin*. *See* 525 F.3d at 812.

9

M.D. Rand, however, contends that, at the time he responded to the Questions in the application documents, he answered them truthfully, particularly if the Court views the facts in the light most favorable to him. (ECF No. 77 at 10.) M.D. Rand insists that his knowledge of Michael's death *at the time* he responded to the Questions do not support MedChoice's arguments that he should have responded in the affirmative to these Questions. He argues he had a reasonable basis to conclude Michael's death was caused by Michael's own conduct because the examining coroner had determined that Michael had died from a combination of alcohol and oxycodone. (ECF No. 77 at 12.) Thus, according to M.D. Rand, he would not have had reason to be aware of a compensable event, of any injuries to patients from services he provided, or of any potential claims against him. (*Id.* at 11–13.) He also implicitly argues that he did not violate NRS § 687B.110 by making misrepresentations, omissions, incorrect statements, or concealing facts at the time he completed the application documents.

Viewing the evidence in the light most favorable to M.D. Rand and drawing all reasonable inferences in his favor, a reasonable jury could conclude that given the Questions on the application documents were so broadly written (*see supra* at Section II.A)—indeed to the extent of being virtually ambiguous to a certain degree—that M.D. Rand did not mislead MedChoice by answering "no" to them. A reasonable jury could accept M.D. Rand's explanation that Michael's death having been caused by a combination of alcohol and oxycodone supported his negative responses to the Questions.[11]

However, the favorable inferences ultimately cannot prevent summary judgment because of other undisputed facts that M.D. Rand knew at the time he responded to the

///

---

[11]The Court notes that in the Criminal Case, in response to the Court's question in connection with M.D. Rand's guilty plea, he admitted that he "knew that by prescribing such a significant dose of oxycodone [to Michael] on September 30th, given the information that was related to [him] that what [he] did would result in a threat to [Michael's] life." (*See* Criminal Action, ECF No. 599 at 55.)

10

Questions. Particularly, M.D. Rand does not contest the other information his plea agreement reveals—that beginning years before he applied for the Policy he had a practice of prescribing R.W. various types of opioids for no legitimate medical purpose and not in the usual course of professional practice.[12] (ECF No. 52-10 at 8–9.) In fact, in the Criminal Case, M.D. Rand admitted that he prescribed significant quantities of oxycodone in varies dosages to R.W. not in the usual course of professional practice and not for a legitimate medical purpose. (ECF No. 599 at 57–59, 67–68.) He also admitted to acting likewise illegitimately when prescribing the dosages to Michael. (ECF No. 52-10. at 7.) Undoubtedly—and as MedChoice argues—this information was material[13] either to the acceptance of the risk, or hazard MedChoice would assume, *see* NRS § 687B.110(2). Based on the unquestionable admissions in his plea deal, M.D. Rand at minimum made a material misrepresentation when he represented that he knew of "no other relevant facts which might affect the underwriter's judgment when considering [his Policy application] which might be material to the underwriter's risk." (ECF No. 52-3 at 10.) While this catch-all statement is broad when considered in general, it is not when considered in the context of M.D. Rand's admission—that he knew he prescribed significant quantities of opioids outside the usual course of professional practice and not for a legitimate medical purpose. Of course, an insurer would not ordinarily jump at the opportunity to insure a doctor unlawfully prescribing opioids. Accordingly, the Court grants summary judgment on MedChoice's claims for rescission of the Policy and Endorsement pursuant to NRS § 687B.110.

///

---

[12]While, as indicated *supra*, M.D. Rand tries to distinguish what he admitted to in the Criminal Action with what he knew at the time he completed the application documents (ECF No. 77 at 9–10), his admission to prescribing opioids in his plea agreement, and particularly oxycodone, not for a legitimate medical purpose involved his conduct at the time he prescribed the drugs, not his reflection on his conduct at the time he entered the guilty plea.

[13]Black's Law Dictionary defines "material" as "[o]f such a nature that knowledge of the item would affect a person's decision-making." *Black's Law Dictionary* (10th ed. 2014). Defendants do not argue that there is a lack of materiality.

11

Further, because the Court finds MedChoice is entitled to rescission of the Policy, the Court need not consider the alternative theories of non-coverage concerning either the Yenick or Fribourg Lawsuits (Counts III and VI). Likewise, the Court will grant summary judgment on Count V—a declaration that MedChoice is entitled to reimbursement for defense costs it expended, pursuant to a duty to defend in the Yenick Lawsuit under the Policy which it has been found entitled to rescind. *See Great Am. Ins. Co.*, 943 P.2d at n.6 ("A *priori*, where there has been a valid rescission of the contract, there is no longer any contract to enforce.").[14]

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motion before the Court.

It is therefore ordered that MedChoice's motion for summary judgment (ECF No. 65) is granted in part and denied in part. It is granted as to Counts I and II for rescission. Therefore, Count V is granted. It is denied as to the alternative requests for partial summary judgment—Counts III and IV.

It is further ordered that MedChoice's objection (ECF No. 83) be stricken.

DATED *nunc pro tunc* THIS 25th day of September 2018.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

---

[14]MedChoice expressed that it "is prepared to return the premium [Defendants paid for the Policy] upon this Court's ruling that it is entitled to rescission. (*See, e.g.*, ECF No. 81 at 11 n.8.)